# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT GUYTON, JR., K74977,      )
            )
          Petitioner,        )
            )
         v.            )       23 C 16464
            )
CHARLES TRUITT, Warden, Statesville     )
Correctional Center,         )
            )
          Respondent.       )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge**:

Before the Court is Petitioner Robert Guyton, Jr.'s petition for a writ of habeas corpus. For the following reasons, the Court denies the petition and declines to issue a certificate of appealability.

## BACKGROUND

Following a bench trial in the Circuit Court of Kane County, Illinois, Petitioner was convicted of aggravated kidnapping and first-degree murder in connection with the abduction and death of David Steeves, Jr. He was sentenced to consecutive prison terms totaling 56 years. The Court draws the following factual history from the state court

record and the Illinois Appellate Court's recitation of the facts in *People v. Guyton*, No.

2-07-0020 (2009) (unpublished), and *People v. Guyton*, 2023 IL App (2d) 220337-U.[1]

## I. Bench Trial[2] and Conviction

The pertinent evidence presented at trial is as follows. On April 8, 2005, at

9:09 p.m., the Elgin police received a 911 call from an individual who said he was in a

car's trunk. The call terminated, and attempts to call back were unsuccessful. The 911

call originated from a phone registered to Steeves's mother. Sometime after 9 p.m.,

Phillip Van Heurek, who lived at 555 South Street in Elgin, saw a car pull into the

driveway across the street and turn its lights off. Van Heurek then heard what he

thought was a gunshot. He did not call the police. Scott Galston, who also lived nearby,

thought he heard a gunshot at about 9:15 or 9:20 p.m. The next morning, police

discovered a bloody shoe in a puddle of blood at 610 South Street in Elgin. There was

a trail of blood leading toward the street where Galston lived.

An Elgin detective visited Steeves's parents' home on April 9, 2005, and was

told that Steeves had not come home the night before. Steeves's parents identified their

son's voice as that of the 911 caller from the night before. The detective learned from

---

[1] The state court's factual findings are presumed correct unless Petitioner rebuts that presumption by clear and convincing evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. § 2254(e)(1)). Petitioner has not made such a showing here.

[2] Petitioner was represented by a Public Defender. Shortly before the trial, defense counsel informed the court that Petitioner had filed an ARDC complaint against him, but that he had not yet seen it. The trial court took a recess to allow defense counsel to obtain a copy. After reviewing the complaint, defense counsel told the court that Petitioner's complaint was "not any kind of problem," and he would not be required to answer it. Petitioner raised no objection, and the trial court allowed counsel to continue representing Petitioner.

Steeves's friends that his last known location was an apartment at 433 South Street in Elgin, whose residents included Twyman Boyd and Ryan Kluender ("South Street Apartment"). On April 13, 2005, a .22-caliber shell casing was found near the apartment. On April 14, 2005, police discovered Steeves's car parked outside one of the buildings at the Harrison View Apartments in Rockford. His body was in the trunk. Steeves had been shot in the left leg and left side of the jaw. According to residents, the car had been there for a few days. During Steeves's autopsy, .44-caliber bullet fragments, including a bullet jacket, were recovered from his body.

The evidence linking Petitioner to Steeves's death was as follows. On April 8, 2005, Petitioner, Armin Henderson, and Shamekin Higgs visited Boyd and Kluender at the South Street apartment. Boyd testified that Higgs arrived with Petitioner sometime between 1 and 2 p.m. Higgs brought a camouflage rifle case into the apartment and put it on the floor under the computer. Later that day, Kluender arrived at the apartment. Kluender testified he called Steeves at around 7 p.m. Kluender told Petitioner that he planned to buy marijuana from Steeves when he came over. Kluender thought that Petitioner asked if he could buy marijuana, too. Kluender told Petitioner that he could not. Petitioner left shortly thereafter. Steeves arrived about 15 minutes after Kluender spoke with Petitioner. Kluender bought marijuana from Steeves and asked Steeves if he wanted to smoke it with him. Steeves declined, saying that he was in a rush to meet someone. Petitioner, Henderson, and Higgs were gone when Steeves left the apartment. Kluender heard no unusual noises after Steeves left. Kluender testified on cross-

3

examination that, when interviewed by police on April 9 and 10, 2005, he did not remember or mention that Petitioner, Henderson, and Higgs had been at the apartment. However, when interviewed again on April 11, 2005, he said they had been.

Boyd testified that he heard Kluender speaking with Petitioner about buying marijuana. Boyd also heard Petitioner and Henderson talking. Boyd asked what they were talking about. Petitioner responded that he was going to "hit" Steeves. Petitioner left with Henderson. Higgs stayed at the apartment another 10 or 15 minutes. On cross-examination, Boyd testified that, when interviewed by police on April 9, 2005, he said that Petitioner left the apartment before Steeves arrived. Boyd admitted that this was a lie and that Steeves arrived at the apartment while Petitioner was there. Boyd also admitted that he forgot to tell the police that Henderson was present and that it was not until a later interview on April 11, 2005, that he told police that Petitioner said that he was going to "hit" Steeves.

Lindsay Harnicker testified that, at around 8 p.m. on April 8, 2005, Petitioner called her and asked her to pick him, Henderson, and Higgs up at his cousin's house on South Street in Elgin. She replied that she had been sleeping. Petitioner said that he would call back. Between 8 and 9 p.m., Higgs called Harnicker and asked to be picked up at a white house next to a high-rise building on Route 31 in Elgin. When Harnicker arrived, Higgs was alone, carrying an empty camouflage rifle case. They waited for Petitioner and Henderson to arrive. While waiting, Harnicker received several calls from Higgs's wife, Robin. She also received calls from an unknown number and passed

the phone to Higgs, who answered and spoke to Petitioner. Ultimately, Harnicker drove Higgs to his home in Arlington Heights. Robin testified that Higgs arrived home at about 11:30 p.m.

Higgs testified that, on April 8, 2005, he had been at "E's" house in Elgin with Petitioner and Henderson before visiting the South Street apartment. He had seen Petitioner holding a .22- caliber rifle before they left E's house. He also saw Henderson with a handgun at E's house. A girl who was possibly named Janis[1] drove the three to the South Street apartment. Petitioner brought the camouflage gun case into Janis's car. Higgs was "pretty sure" that there was a weapon in the case. At Petitioner's direction, Higgs brought the case into the apartment. Petitioner took the weapon out of the case and gave the case to Higgs. Petitioner said he did not want the case anymore. Higgs later left the case in Harnicker's vehicle, and it ended up in the garbage. Petitioner and Henderson left the South Street apartment before Higgs. Harnicker drove Higgs home.

Higgs testified that, on April 9, 2005, Petitioner called Higgs and asked him to bring some clothes and toiletries for him to the home of Higgs's cousin, Devon McCarthy, in Belvidere. On April 10, 2005, Higgs traveled to McCarthy's home with Robin, their children, and Harnicker.[3] After they arrived, Petitioner and Henderson arrived. Petitioner told Higgs that he and Henderson had robbed the marijuana dealer

[1] An affidavit from a Janice Thomas was included with Petitioner's amended postconviction petition. Apparently, this is the same individual.

[3] The record indicates that Petitioner's brother, Shauntay, had traveled to McCarthy's home in a separate vehicle.

from the South Street apartment. Petitioner said that the dealer did not want to give up the money, so Petitioner shot him in the leg. Petitioner also said that he and Henderson put the dealer in the trunk of a motor vehicle. Petitioner said that the dealer was shot again after Henderson heard the dealer using his phone. Petitioner did not say who fired the second shot. Harnicker drove Petitioner and the Higgs family to the Higgs family's home in Arlington Heights. Higgs and Petitioner then took a train to Elgin. They stayed overnight at a woman's house. Higgs then went home.

The police interviewed Higgs on April 12, 2005. He told them that he had seen Steeves leave the South Street apartment on April 8, 2005. After Steeves left, Petitioner approached him and asked for money. Steeves refused, and Petitioner shot him in the leg.

Higgs admitted that he had prior convictions of robbery and possessing a weapon without a Firearm Owner's Identification Card. He also had a pending charge of unlawful possession of a weapon by a felon. Higgs had an agreement with the State that he would receive a sentence of probation if he testified truthfully. He admitted that his statement to police about witnessing Petitioner shoot Steeves differed from his trial testimony. He also admitted that other statements during his interview with police differed from his trial testimony.

McCarthy testified that, at around 11 a.m. on April 9, 2005, he received a call from Petitioner, who asked McCarthy to pick him up in Rockford near a Walgreens drugstore on Harrison Avenue. When McCarthy arrived there, Petitioner was with

Henderson. McCarthy dropped off Petitioner and Henderson at Petitioner's mother's residence and then went home. Later that day, Petitioner and Henderson went to McCarthy's home.

Elgin detective Daniel O'Shea testified that he and another detective interviewed Henderson[2] on April 15, 2005. At the conclusion of the interview, O'Shea asked Henderson "to turn over handguns used in the murder" of Steeves. Later, O'Shea and an officer met with Henderson, who used O'Shea's cell phone to call "an unknown person who he said was holding a firearm for him[.]" Henderson arranged to pick up the gun. Accompanied by police in an unmarked car, Henderson retrieved a .44-magnum handgun and a bag holding ammunition. Forensic testing matched that gun to the bullet jacket recovered from Steeves's body.

The trial court found Petitioner guilty of first-degree murder and aggravated kidnapping. It indicated that it treated Higgs's testimony as if he were an accomplice, subjecting it to high-level scrutiny. Nonetheless, the trial court found that the evidence corroborated Higgs's critical testimony. It also found that (1) either Petitioner or Henderson fired the weapon that fatally wounded Steeves and (2) Petitioner was accountable for Henderson's acts.

## II. Direct Appeal

On direct appeal, Petitioner argued that: (1) the State failed to prove him guilty

---

[2] Henderson was called as a witness, but after testifying that he was 26 years old and had been held in the Kane County jail for a year, he refused to testify further.

of murder or kidnapping beyond a reasonable doubt; (2) the evidence was insufficient to establish that Steeves had been "secretly confined" within the meaning of the kidnapping statute; and (3) the trial court failed to hold a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), despite Petitioner having filed an ARDC complaint against trial counsel.

The state appellate court affirmed the decision of the trial court. Petitioner renewed his claims in a petition for leave to appeal ("PLA") in the Illinois Supreme Court, which denied leave to appeal on November 25, 2009. Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court.

### III.    State Postconviction Petition

On May 25, 2010, Petitioner filed a pro se petition under Illinois's Post-Conviction Hearing Act seeking relief from his conviction. In the pro se post-conviction petition, Petitioner argued that (1) due process was violated when the State pursued a theory of accountability; (2) trial counsel was ineffective for failing to effectively challenge the State's accountability theory; and (3) direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness. The trial court appointed counsel for Petitioner and, in the years that followed, a succession of attorneys represented Petitioner. Ultimately, on August 4, 2021, attorney Sandra Blake filed an amended post-conviction petition, claiming: (1) trial counsel was ineffective for failing to interview potential defense witnesses and failing to "counter" the State's accountability theory; and (2) appellate counsel was ineffective for failing to argue on

8

direct appeal that trial counsel was ineffective. Affidavits from Cindie Britton, Janice Thomas, Larry Giles, Shauntay Chapman, and Henderson were attached to the petition.

According to Britton's affidavit, Petitioner and Higgs came to her home on the evening of April 10, 2005. Early the next morning, while Petitioner was sleeping, Britton saw Higgs with a bag in his lap. Later, she saw Higgs apparently trying to leave her home surreptitiously. Higgs told Britton he was going to buy cigars. He left the bag behind. The bag contained bullets and money. There appeared to be blood on the money. Britton woke Petitioner and told him she wanted the bag out of her home. Petitioner appeared confused. He tried calling Higgs, but Higgs did not answer. Britton averred that she was not interviewed before Petitioner's trial.

Thomas's affidavit indicated that, on April 8, 2005, she drove Petitioner, Higgs, and Henderson to a house on South Street in Elgin. She saw Higgs with a camouflage gun case. She did not see Petitioner carrying anything.

Giles's affidavit indicated that, on April 10, 2005, he and Petitioner were at Giles's girlfriend's apartment in Rockford. Petitioner asked Giles for a ride to Elgin, but Giles refused. McCarthy, Henderson, and Higgs arrived later, and they agreed to meet at McCarthy's apartment.

Henderson's affidavit indicated that, on April 8, 2005, Petitioner left the South Street apartment 20 minutes before Henderson did. Higgs said that Harnicker was going to pick him up. Henderson next saw Petitioner and Higgs a few days later at McCarthy's home.

Chapman's affidavit indicated that, in April 2005, he was with Petitioner, Henderson, Harnicker, the Higgs family, and McCarthy at McCarthy's home. Petitioner told Chapman that "they could have 'did some ill s***.'" Petitioner told Chapman that he did not know exactly what had happened but had an idea and did not want to know more. Petitioner expressed concern that Henderson might want to "do something" to him.

On August 10, 2021, Attorney Blake filed a "Certificate of Counsel Pursuant to Illinois Supreme Court Rule 651(c)."[4] On October 13, 2021, the State moved to dismiss the petition. On December 6, 2021, Blake was allowed to withdraw as counsel and private counsel, Attorney Jonathan Minkus, entered his appearance for Petitioner. Minkus filed a Rule 651(c) certificate and did not make any amendments to the amended post-conviction petition. Minkus's Rule 651(c) certificate did not affirm that he made all the amendments necessary to adequately present Petitioner's contentions of error. The trial court granted the State's motion to dismiss on August 22, 2022, and Petitioner filed a timely notice of appeal.

## IV.    Postconviction Appeal

The trial court appointed OSAD to represent Petitioner. After reviewing the record, however, the appellate defender concluded there were no issues of arguable

---

[4] Rule 651(c) mandates that appointed counsel for a petitioner must consult with them, review the trial record, and amend the petition to ensure that all constitutional claims are adequately presented. Ill. S. Ct. R. 651(c). Complying with this rule creates a presumption that the petitioner received reasonable assistance from their counsel. *See People v. Smith*, 2022 IL 126940, ¶ 29.

merit and moved to withdraw as counsel under *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *People v. Lee*, 251 Ill. App. 3d 63 (1993). The appellate court granted counsel's motion to withdraw and affirmed the decision of the trial court.

Applying *Strickland v. Washington*, the appellate court first found that the trial court did not err in dismissing Petitioner's claim of ineffective assistance based on trial counsel's failure to interview and call Britton, Thomas, Giles, Henderson, and/or Chapman because, even if counsel had presented their testimony, there was no reasonable probability that it would have changed the outcome of the trial. The appellate court also rejected Petitioner's claim that trial counsel had been ineffective for failing to "counter" the State's accountability theory, because Petitioner made no argument that counsel's performance had been deficient and instead argued merely that the State's evidence had been insufficient to prove his guilt beyond a reasonable doubt—a claim rejected on direct appeal. Appellate counsel could not have rendered ineffective assistance by failing to raise these meritless allegations of trial counsel's ineffectiveness. Lastly, the appellate court concluded that post-conviction counsel did not provide unreasonable assistance.

Petitioner then filed a pro se PLA in the Illinois Supreme Court, alleging only that postconviction counsel Minkus had provided unreasonable assistance. The Illinois Supreme Court denied the PLA in September 2023.

11

### V.    Federal Habeas Proceedings

On November 30, 2023, Petitioner filed a timely federal habeas corpus petition.

The petition claims:

(1)    Trial counsel was ineffective for failing to interview and call the witnesses who provided affidavits in support of petitioner's post-conviction petition, "who would have proven that petitioner made every effort to get away from co-defendant Armin Henderson out of fear for his own safety;"

(2)    Direct appeal counsel was ineffective for declining to challenge petitioner's conviction on an accountability theory where the State had proceeded as though he were the principal offender until the day of trial;

(3)    Trial counsel rendered ineffective assistance by obstructing the trial court's ability to hold a *Krankel* hearing where counsel told the trial court "we can proceed" despite petitioner having filed an ARDC complaint against trial counsel; and

(4)    Direct appeal counsel rendered ineffective assistance by failing to raise trial counsel's ineffective assistance regarding petitioner's ARDC complaint.

Dkt. # 1, at 5–7.

Respondent answered the Petition on April 18, 2024.  Petitioner was granted four extensions of time to file his reply brief, extending the due date from May 16, 2024, to December 20, 2024.  *See* Dkt. ## 21, 23, 27, 29.  On November 25, 2024, Petitioner filed a motion to stay the proceedings.  Dkt. # 31.  A briefing schedule on the motion to stay was set, and briefing on the habeas petition was suspended while the stay request was resolved.  Then, on December 9, 2024, Petitioner filed a motion for a fifth extension, Dkt. # 32, requesting an additional 90 days to file his reply brief.  The Court

found another extension was unwarranted, and the due date for Petitioner's reply in support of his motion to stay remained December 20, 2024. Petitioner belatedly filed his reply in support of his motion to stay on February 14, 2025. On May 6, 2025, the Court denied the motion to stay, ordered Petitioner's reply in support of his habeas petition due by June 9, 2025, and warned Petitioner there would be no further extensions. Petitioner failed to file a reply brief, and so the Court proceeds with ruling on the habeas petition based on the papers presently before it.

## **DISCUSSION**

### I.    **Petitioner's Claims Are Procedurally Defaulted**

To preserve a claim for federal habeas review, "state prisoners must give the state courts one full opportunity" to resolve the prisoner's claim by raising it through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Illinois, a habeas petitioner must present his claim to all three levels of the Illinois courts — trial, appellate, and supreme court — to avoid procedural default. *Id*. A petitioner fairly presents a federal constitutional claim only when he articulates both the operative facts and the controlling legal principles, *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004), and sufficiently alerts the state courts to the federal underpinnings of his claim, *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995). Failure to fairly present a claim results in a procedural default. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004).

Here, Respondent argues Petitioner's claims are procedurally defaulted because Petitioner failed to fairly present them through one full round of state court review. More specifically, Respondent says that by "confining his arguments to the unreasonable assistance of postconviction counsel, [P]etitioner procedurally defaulted any underlying constitutional claim(s)." Dkt. # 18, at 16. Importantly, "an assertion that one's counsel was ineffective for failing to pursue particular constitutional issues is a claim separate and independent of those issues." *Lewis*, 390 F.3d at 1026. Respondent is correct that Petitioner's post-conviction PLA focuses almost exclusively on postconviction Attorney Minkus's performance deficiencies; the only reference to trial counsel in the PLA is the statement: "Defendant filed a pro se petition alleging that his trial counsel provided ineffective assistance, at the second stage." Dkt. # 18-15, at 12. It would seem, then, that any ineffective assistance of trial or appellate counsel claims are procedurally defaulted because they were not raised in Petitioner's post-conviction PLA.

However, the Seventh Circuit has found an alternate basis in certain cases for avoiding default and proceeding to the merits where a petitioner's claim in federal court was embedded in an ineffective assistance of counsel claim in state court. *Malone v. Walls*, 538 F.3d 744, 754–55 (7th Cir. 2008); *see also McGee v. Bartow*, 593 F.3d 556, 567 n.9 (7th Cir. 2010). *Malone* and its progeny show that this Court can reach the merits of certain claims that, while not presented as standalone claims to the state courts, were embedded in another claim.

14

In *Malone*, though, while the petitioner's post-conviction appellate brief phrased its claim as challenging appellate counsel's ineffectiveness, the brief "specifically detailed the ways in which his trial counsel was ineffective," and "ma[de] clear that he [wa]s seeking redress of his trial counsel's failures" in addition to challenging his appellate attorney's ineffectiveness. 538 F.3d at 754. Unfortunately, we cannot say the same for Petitioner. His post-conviction PLA offers no insight into the ways in which trial or direct appeal counsel might have rendered ineffective assistance. His claims are defaulted.

### A. Claim 1

In Claim 1, Petitioner asserts trial counsel was ineffective for failing to interview and call the witnesses who provided affidavits in support of Petitioner's post-conviction petition. While this claim is defaulted, it does present a closer call than the other claims. Even if we were to consider the merits of Claim 1, however, it would still fail. To establish ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must show: (1) his trial attorney's performance "fell below an objective standard of reasonableness," informed by "prevailing professional norms;" and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). When analyzing the *Strickland* performance prong, courts presume counsel's conduct is within the "wide range of reasonable professional assistance." *Laux v. Zatecky*, 890 F.3d 666, 674 (7th Cir. 2018) (quoting *Strickland*, 466 U.S. at 689).

15

When the question of effective assistance of counsel is presented in a habeas petition under Section 2254, the court does not directly apply the *Strickland* standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Rather than focusing on the actions of counsel, the federal court focuses on the actions of the state court in applying *Strickland*. The court will grant a habeas petitioner relief only if no fair-minded jurist could find that the state court's decision about whether counsel was ineffective was correct. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 654 (2004)). Thus, it is not enough that the federal court might find that the state court's decision was incorrect; the federal court must find that it was so far outside of the appropriate range of differences of opinion that it was unreasonable. *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009).

With respect to Claim 1, the state appellate court, applying the *Strickland* standard, determined that the lawyer's assistance to Petitioner had not been ineffective. The appellate court concluded that even if counsel had interviewed and/or called Britton, Thomas, Giles, Henderson, and Chapman to testify, there was no reasonable probability that their testimony would have changed the outcome of Petitioner's trial, and therefore Petitioner suffered no prejudice. We must affirm unless convinced that the state court's determination was unreasonable. *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006). The reasonableness inquiry "is quite deferential, such that a state decision may stand so long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005).

When a defendant's lawyer has failed to interview key actual or potential witnesses and in postconviction proceedings those witnesses give testimony that the defendant contends a competent lawyer could have elicited by interviewing them before trial and could have used effectively at the trial, two questions arise. *Stanley v. Bartley*, 465 F.3d 810, 813–14 (7th Cir. 2006). The first is whether they actually would have told the lawyer the same thing before trial, and the second is whether, if they had, the defendant would have had a reasonable chance of being acquitted. *Id*.

According to Britton's affidavit, Petitioner and Higgs came to her home on the evening of April 10, 2005. Early the next morning, Britton saw Higgs with a bag in his lap and later saw him trying to sneak out. The bag Higgs left behind contained bullets and money, and there appeared to be blood on the money. This testimony suggests Higgs's involvement but would not have refuted the wealth of evidence of Petitioner's involvement in the kidnapping and murder. And, although this testimony would impact the credibility of Higgs's testimony against Petitioner, the trial court treated Higgs's testimony as that as an accomplice and highly scrutinized it.

The appellate court reasonably concluded that none of the testimony from the other witnesses would have changed the outcome of the trial. Thomas's testimony that she saw Higgs with a camouflage gun case would have been duplicative of Boyd's and Harnicker's testimony. Henderson refused to testify at trial, so any potentially exculpatory evidence offered in his affidavit could not have affected the trial's outcome. Similarly, any potentially exculpatory information in Chapman's affidavit was

17

defendant's inadmissible self-serving hearsay and thus could not have affected the trial's outcome. And Giles's testimony that Petitioner was at his house the morning of April 10th and that when McCarthy, Henderson, and Higgs arrived later, they agreed to meet at McCarthy's apartment, lacks any probative value. The state appellate court did not unreasonably apply the *Strickland* standard.

## B. Claim 2

In Claim 2, Petitioner asserts that direct appeal counsel was ineffective for declining to challenge Petitioner's conviction on an accountability theory where the State had proceeded as though he were the principal offender until the day of trial. While the Court is mindful that Petitioner was "not required to articulate [his] claims with lawyerly precision because we construe pro se petitioners 'liberally,'" *Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014), Petitioner's post-conviction PLA can in no way be interpreted as raising this claim. Claim 2 was not fairly presented at each level in the state court and is therefore defaulted.

## C. Claim 3

In Claim 3, Petitioner argues that trial counsel rendered ineffective assistance by obstructing the trial court's ability to hold a *Krankel* hearing where counsel told the trial court "we can proceed" despite Petitioner having filed an ARDC complaint against trial counsel. This claim is also defaulted. Petitioner argued on direct appeal that the trial

*court* erred by failing to conduct a *Krankel* inquiry; he did not argue that trial *counsel* rendered ineffective assistance in connection with the *Krankel* issue.[5]

### D. Claim 4

Lastly, Claim 4, that direct appeal counsel rendered ineffective assistance by failing to raise trial counsel's ineffective assistance regarding Petitioner's ARDC complaint, is also defaulted.

### II. Petitioner Cannot Excuse His Defaults

When a petitioner presents a defaulted claim for federal habeas review, we may consider it only if he can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice. *Johnson v. Loftus*, 518 F.3d 453, 455–56 (7th Cir. 2008). Petitioner fails to argue either point, and so we cannot consider his claim.[6]

---

[5] To the extent that Petitioner intended to raise the *Krankel* claim that he exhausted on direct appeal, we agree with Respondent that such a claim raises a non-cognizable issue of state law, and Petitioner is not entitled to habeas corpus relief on this basis. *See Payton v. Pfister*, 2015 WL 5829749, at *14 (N.D. Ill. 2015) (collecting cases holding that a *Krankel* claim raises non-cognizable state law issue); *Hall v. Lashbrook*, 2018 WL 6830326, at *5 (N.D. Ill. 2018).

[6] Petitioner's cause argument in his reply in support of his motion to stay, to the extent we would be willing to consider it in evaluating his petition, is unavailing. Petitioner says, "As to the cause of the petitioner's failure to exhaust the issues in question, it is only due to the ineffective assistance of appellate counsel upon his appeal of the post-conviction." Dkt. # 36, at 6. But Petitioner cannot use a claim of ineffective assistance of post-conviction counsel to establish cause and prejudice for the default because he has no constitutional right to post-conviction counsel. *Oaks v. Pfister*, 863 F.3d 723, 727 (7th Cir. 2017) (citing *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017).

### III.    The Court Declines to Issue a Certificate of Appealability

For the reasons stated above, Petitioner's habeas petition is denied, and the Court declines to issue a certificate of appealability.  28 U.S.C. § 2253(c)(2).  The Court cannot conclude "both 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'"  *Gonzalez v. Thaler*, 65 U.S. 134, 140–41 (2012) (quoting *Slack v. McDonald*, 529 U.S. 473, 484 (2000)).

Petitioner is advised that this is a final decision ending his case in this Court.  If Petitioner wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(1).  Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights.  However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b).  Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment.  *See* Fed. R. Civ. P. 59(e).  The time to file a motion under Rule 59(e) cannot be extended.  *See* Fed. R. Civ. P. 6(b)(2).  A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).  Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order.  *See* Fed. R. Civ. P. 60(c)(1).  The time to file a Rule 60(b) motion cannot be extended.  *See* Fed. R. Civ.

20

P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus [1] is denied and the Court declines to issue a certificate of appealability. The Clerk directed to enter a Rule 58 judgment in favor of Respondent and against Petitioner. Case terminated.

It is so ordered.

Dated: 8/12/2025

Charles P. Kocoras
United States District Judge

21